Filed 2/27/15  Myrick v. Hansa CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KODY PAUL MYRICK,<br><br>    Plaintiff and Appellant,<br>        v.<br><br>S. NICK HANSA,<br><br>    Defendant and Appellant. | A139810<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC-11-515329) |

S. Nick Hansa, M.D., appeals a medical malpractice judgment against him, in favor of plaintiff Kody Paul Myrick. The claim arises from Hansa's failure to take immediate measures to treat plaintiff's stroke, although some irreparable damage had already occurred before Hansa assumed his care. Claims against other medical providers who provided earlier treatment were settled prior to trial. On appeal, Hansa does not challenge the jury's finding that his treatment of plaintiff fell below the applicable standard of care, but he contends the evidence is insufficient to support the jury's finding that his negligence caused plaintiff's injury. He also contends the court erred in instructing the jury with regard to causation, calculation of damages, and the allocation of responsibility between him and the other medical providers. In addition, plaintiff has filed a cross-appeal challenging the trial court's calculation of prejudgment interest. We find no error in the court's instructions or in the sufficiency of the evidence. We conclude, however, that the court erred in the calculation of prejudgment interest.

1

## Factual and Procedural Background

Plaintiff's complaint alleges a single cause of action for negligence. The following evidence was presented at trial:

On Saturday, July 31, 2010, between 7:30 p.m. and 8:00 p.m., plaintiff suffered a life-threatening stroke. He was immediately taken by his father to Bakersfield Memorial Hospital (BMH). When he arrived at 8:50 p.m., the triage nurse identified his complaint as a possible stroke. The emergency room doctor, Dr. Caroline Han, ordered a CT scan. Unfortunately, the CT scan was misread by the radiologist, Dr. Bernard Maristany. Maristany identified a lacunar infarct, which is caused by small strokes, in the left thalamus but failed to identify the blood clot in the basilar artery in the back of plaintiff's brain which, it was later determined, had caused plaintiff's stroke.

Hansa was the internist on call for BMH the night of plaintiff's stroke. Plaintiff's care was transferred to Hansa from Han between 11:40 p.m. and midnight. Hansa was informed of plaintiff's symptoms and the possible stroke diagnosis. Han asked Hansa whether he would like her to call a neurologist, but Hansa said that would be done as part of plaintiff's admission to the hospital. Hansa gave orders by telephone to have plaintiff admitted to BMH with the diagnosis of a possible stroke.

Plaintiff spent the next eight hours on the ward at BMH, where nurses performed neurologic checks every two hours. Plaintiff's symptoms fluctuated over the course of the night. Although he could not speak when he entered the emergency room, by 1:50 in the morning he was able to speak and answer questions and to move his right side on command. At 8:15 a.m. on August 1, however, plaintiff suddenly lost consciousness and control of his airway. The rapid response team was called. He was intubated and taken to the intensive care unit. As noted above, subsequent tests showed that a blood clot had traveled to plaintiff's brain, blocking his basilar artery. After 20 days at BMH, plaintiff was transferred to Santa Clara Valley Medical Center, where he remained hospitalized for the next few months. At the time of trial, plaintiff could walk only a few steps when assisted by his parents and had difficulty speaking.

Considerable expert testimony was offered at trial. In summary, the expert testimony established that a stroke is a medical emergency requiring immediate evaluation and diagnosis because the window of time for successful treatment is measured in hours. "When possible stroke is raised as a possibility, . . . that mandates activation of a stroke alert and activating people who can help provide that therapy . . . [b]ecause the longer you wait, the therapy is less effective and at some point the window is completely closed for that therapy." For example, t-PA (tissue plasminogen activator) is a clot-dissolving medication that can be given stroke patients up to four and one-half hours after the onset of symptoms. The experts agreed that plaintiff was outside the treatment window for t-PA when his care was transferred to Hansa around midnight. Another treatment option is a thrombectomy, which involves sending a device up a vessel to catch and remove the blood clot. The window for a thrombectomy is generally eight hours after the onset of symptoms.

BMH is a community hospital that is not equipped to handle certain medical emergencies. In 2010, BMH had a teleneurology system in place for physicians to obtain emergency neurology evaluation of any patient who presented with a possible stroke. BMH, as a community hospital, also had a system to transfer patients to tertiary care centers if more complicated procedures such as a thrombectomy were deemed necessary.

Plaintiff's expert, Benny Gavi, M.D., testified that Hansa violated the standard of care by admitting plaintiff to BMH instead of referring him to a neurologist immediately. He also opined that if the teleneurologist had been called around midnight and consulted about plaintiff's condition, the teleneurologist would have asked for a CT angiogram and informed the treating doctor that the patient will need to be transferred to a tertiary care center. Another expert, Dr. Steven Hetts, testified that plaintiff's outcome would have been substantially improved if a thrombectomy had been performed the morning of August 1.

The jury returned a unanimous verdict in favor of plaintiff. The jury found that Hansa was negligent, and that his negligence was a substantial factor in causing harm to plaintiff. The jury found that plaintiff's economic and non-economic damages totaled

3

more than $12 million and allocated 40 percent of the fault to Hansa. After deducting amounts received in the prior settlements, the court entered judgment against Hansa in the principal amount of $4,596,375 plus $473,426 interest.

Hansa filed a timely notice of appeal. Plaintiff cross-appealed.

**Discussion**

## I. Direct Appeal

1. *Substantial evidence supports the jury finding of causation.*

The jury was instructed that to establish his claim against Hansa, plaintiff must prove, among other elements, that Hansa's negligence was a substantial factor in causing plaintiff's harm. The instructions explained that "[a] substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct." The jury was also instructed, "A person's negligence may combine with another factor to cause harm. If you find that Sahaphun Hansa, M.D.'s negligence was a substantial factor in causing Kody Paul Myrick's harm, then Sahaphun Hansa, M.D. is responsible for the harm Sahaphun Hansa, M.D. cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing Kody Paul Myrick's harm." Finally, the jury was instructed, "If you find that the negligence or fault of more than one person including Sahaphun Hansa, M.D was a substantial factor in causing Kody Paul Myrick's harm, you must then decide how much responsibility each has by assigning percentages of responsibility to each person listed on the verdict form. The percentages must total 100 percent. [¶] You will make a separate finding of plaintiff's total damages. In determining an amount of damages, you should not consider any person's assigned percentage of responsibility."[1]

---

[1] The special verdict form listed both Han, the emergency room doctor who treated plaintiff, and Maristany, the radiologist who misread plaintiff's CT image, as others whose negligence may have caused harm to plaintiff.

4

During deliberations, the jury requested clarification of an apparent conflict between the jury instructions and special verdict form. The jury's note reads: "If we find Dr. Hansa's conduct was negligent and and [*sic*] move on to determining damages, are we determining the damages for each item of harm caused solely by Dr. Hansa's conduct or damages for the harm caused by all three named individuals for whom we later apportion responsibility? [¶] The jury instructions on Tort Damages state: 'The amount of damages must include an award for each item of harm that was caused by S. Hansa's wrongful conduct . . . .' However the special verdict form Question # 3 asks 'What are plaintiff K. Hynick's damages?' implying that we are to consider/determine harm and damages caused by all three named individuals combined." Contrary to Hansa's argument, the jury's question did not indicate confusion with regard to causation. The jury clearly indicated that it had already determined that Hansa's conduct had caused at least some harm to plaintiff. The court's response merely repeated the instructions already given on negligence, causation and substantial factor. We see nothing in those instructions likely to cause confusion. It is immaterial whether plaintiff's injury is considered indivisible, as argued by plaintiff, or divisible, as Hansa argued. Hansa contends the court should have told the jury that "if you think that [part of the harm] was complete before Dr. Hansa did anything wrong, then you have to try to separate what was complete from what Dr. Hansa did." However, if plaintiff's brain damage was complete and irreversible prior to Hansa's treatment, Hansa's negligence was not a substantial factor in causing the harm. If the brain damage continued to increase after Hansa assumed plaintiff's care and was affected by Hansa's failure to act, Hansa's inaction may have been a substantial factor in causing the permanent brain damage that ultimately resulted. As the instructions indicated, in that event he would properly bear a portion of the responsibility for that damage. The court's additional comments, directed to the instructions on the calculation of damages and allocation of responsibility, are discussed *post*.

Hansa contends there is no substantial evidence to support the jury's finding that his failure to consult a neurologist contributed to plaintiff's injury. He argues that

"plaintiff failed to present evidence from the staff at UCLA, or other similar facility, as to the availability of an invasive neuroradiology team before 8:15 a.m. on Sunday, and, if such team were available, that the invasive neuroradiologist would have agreed that plaintiff met the criteria for transfer and for a thrombectomy." To meet his burden, however, plaintiff was not required to present testimony "from the staff at UCLA, or other similar facility" that they would have accepted plaintiff for transfer. Plaintiff was entitled to rely on circumstantial evidence of causation. (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1242 [rejecting argument that proving causation under the "but for" test requires plaintiffs in a legal malpractice action to obtain the testimony of the other parties to the transaction.].) In *Viner,* the court explained, "An express concession by the other parties to the negotiation that they would have accepted other or additional terms is not necessary. And the plaintiff need not prove causation with absolute certainty. Rather, the plaintiff need only ' "introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result." ' " (*Id*. at pp. 1242-1243.) Plaintiff satisfied this burden.

Dr. Steven Hetts testified for plaintiff as an expert in interventional neuroradiology. He testified that both UCLA and Cedars Sinai hospitals were "major tertiary care centers that have neurointerventional radiologists" and that, in his expert opinion, any such "referral center" would be expected to be able to treat acute stroke 24 hours a day, seven days a week. Dr. Kurt Miller, testifying as an expert witness in neurology, testified that in his 22 years working at a community hospital in Fresno, California, he has "never had a problem getting a patient [transferred to a tertiary care center] that [he] thought needed to get [transferred]." On occasion, his patients have been turned down because a facility was full or equipment broken, but he has never heard of two tertiary care centers being full or having broken equipment at the same time. He testified that neurointerventional radiologists are "very eager" to perform thrombectomies. Miller's opinion was echoed by Dr. Raymond Louis Ricci, an emergency medicine doctor, who testified that "[i]t's conceivable that a tertiary care center cannot take a patient because . . . they're full, . . . but the vast majority of time they

6

do take the patient and they will take the patient if they have capacity to do so." He explained that tertiary care centers are "obligated by law to accept the patient" if they can. This evidence is sufficient to establish, to a reasonable degree of probability, the availability of a neurointerventional radiologist to complete the procedure in the early morning hours on August 1 in the Los Angeles area.

Substantial evidence also establishes, to a reasonable degree of medical probability, that a neurointerventionalists at a nearby tertiary care center would have performed the necessary procedure in time to produce a better outcome for plaintiff. Hett testified that "a neurointerventional radiologist who has the proper degree of skill, knowledge and care in their specialty would accept a patient with . . . [plaintiff's] neurologic findings during the night of July 31st" and agreed that had a thrombectomy been performed "before 8:15 in the morning," plaintiff would have had a better outcome. Hett explained, "[W]hen somebody has profound stroke symptoms and is diagnosed with a basilar artery occlusion, we know that the natural history of basilar artery occlusion is dismal, 80 to 90 percent mortality. [¶] And we as neurointerventionalists perform a procedure, thrombectomy, to remove blood clot from the brain, which improves outcomes for patients who have basilar artery occlusion. [¶] So, depending on various factors . . . , we take patients in transfer from outside hospitals to perform that procedure, specifically because a lot of hospitals don't have that level of care." Hett testified that while the "general guideline" for performance of a thrombectomy is eight hours, "for the basilar artery we often leave it up to the individual interventionist's discretion to extend beyond that." He explained that the fact that plaintiff showed improvement over the course of the night suggested that "there may well have been brain to save . . . early in the morning on August 1st" and that, based on the CT scan taken after 8:00 am, "even at that point there may well have been brain to save."

Finally, there is substantial evidence that the procedure reasonably could have been performed within 8 hours after the onset of plaintiff's symptoms. Miller testified that had a neurologist been consulted shortly after midnight, in conformity with the proper standard of care, the neurologist would have asked the treating hospital to obtain a

7

CT angiogram to demonstrate the basilar artery blockage and then would immediately make arrangements for transfer of the patient. Both Miller and Hett testified the CT scanner at the Bakersfield hospital was capable of producing the CT angiogram and that it could have been completed in under 45 minutes. Hett also testified that if Bakersfield informed the neurologist/neurointerventionalist that it would take more than an hour to get the CT angiogram results, a reasonable neurointerventionalist would not have told the hospital to hold the patient until the scans were completed. He explained, " If somebody has stroke symptoms that are really severe and suggest a basilar artery occlusion, then I think that most neurointerventionalists would take the patient in the transfer because then at the tertiary care hospital that receives that patient, they can do upfront imaging . . . or, frankly, take the patient directly to the angiography suite." Hett also testified that based on his experience and background, it can take between approximately 45 and 90 minutes to complete the thrombectomy after the patient arrives at the tertiary care center. Evidence was introduced that Bakersfield has a helipad for patient transfer and that the standard of care requires transport be achieved through the quickest means available. Finally, the evidence establishes that the tertiary care centers in Los Angeles were approximately 100 miles from BMH. The evidence, thus, supports the implicit finding that although time would have been needed to complete the transfer and perform the procedure, it is reasonably likely the procedure would have been completed within the four hours remaining under the preferred time frame for conducting a thrombectomy, had Hansa not failed to act.

2. *The jury was properly instructed on the allocation of responsibility and calculation of damages*.

As set forth above, the jury was instructed that if it found that the fault of more than one person was a substantial factor in causing plaintiff's harm, it would be necessary to allocate responsibility among each of those individuals. Consistent with these instructions, the verdict form stated that if the jury found that Hansa's negligence was a substantial factor in causing harm to plaintiff, it should calculate plaintiff's damages. After calculating plaintiff's damages, the jury was directed to decide whether the

negligence of Dr. Bernard Maristany and Dr. Caroline Han was also a substantial factor in causing harm to plaintiff. Finally, the jury was asked: "What percentage of responsibility for the harm caused to Kody Myrick do you assign to the following persons? Insert a percentage for only those persons whose negligence you have found to be a substantial factor in causing Kody Myrick's harm."

The jury was also instructed: "If you decide that Kody Paul Myrick has proved his claim against Sahaphun Hansa, M.D., you also must decide how much money will reasonably compensate Kody Paul Myrick for the harm. This compensation is called 'damages.' [¶] The amount of damages must include an award for each item of harm that was caused by Sahaphun Hansa, M.D's wrongful conduct, even if the particular harm could not have been anticipated." The jury apparently found this instruction confusing and questioned whether it was inconsistent with the question on the special verdict form asking it to calculate plaintiff's damages, as caused by all three doctors. In response, the court told the jury that after finding that Hansa was negligent and that his negligence was a substantial factor in causing plaintiff's harm, "then you go on to the jury instruction on tort damages. It says, the amount of damages must include an award for each item of harm caused by Dr. Hansa's wrongful conduct. Caused by Dr. Hansa's wrongful conduct is another way of saying 'was a substantial factor in.' " The court continued, "Now, the range of evidence . . . offers the jury the possibility that the harm that Kody Myrick suffered by reason of the stroke and whatever care that was not within the standard of care, that it was made worse or better as time went on. That's the basic range of evidence offered by the experts. [¶] The question you focused on is Dr. Hansa coming in not first in the treatment. If he was negligent . . . [a]nd you have to figure out what the harm is. That's where we go — in the verdict form we go to what are damages . . . . [¶] That's basically what's the harm, right, but that's the total harm." Finally, the court noted that the verdict form offered the jury everything it needed to "arrive at Hansa's percentage of damage."

The court's ultimate response to the jury's question, that the jury should determine "the total harm," was unqualifiedly correct. Hansa contends the trial court should have

9

"explained to the jury to first divide plaintiff's damages by causation, and only *then* apportion liability." He argues the court should have followed the approach set out by the Restatement Third of Torts for the apportionment of liability, which provides: "(a) When damages for an injury can be divided by causation, the factfinder first divides them into their indivisible component parts and separately apportions liability for each indivisible component part under Topics 1 through 4. . . . [¶] (b) Damages can be divided by causation when the evidence provides a reasonable basis for the factfinder to determine: [¶] (1) that any legally culpable conduct of a party or other relevant person to whom the factfinder assigns a percentage of responsibility was a legal cause of less than the entire damages for which the plaintiff seeks recovery and [¶] (2) the amount of damages separately caused by that conduct. [¶] Otherwise, the damages are indivisible and thus the injury is indivisible." (Rest.3d Torts, Apportionment of Liability, § 26.)

Plaintiff's injury was not divisible, however, in the same manner as the damages in the example given by the restatement.[2] As indicated above, if the damage to plaintiff's brain had become permanent and irreversible before Hansa assumed plaintiff's care, Hansa simply played no part in causing his injuries. That, in essence, was the opinion

---

[2] The restatement offers the following illustration of the rule: "A negligently parks his automobile in a dangerous location. B negligently crashes his automobile into A's automobile, damaging it. When B is standing in the road inspecting the damage, B is hit by C, causing personal injury to B. B sues A and C for personal injury and property damage. B's negligent driving and A's negligent parking caused damage to B's automobile. A's negligent parking, B's negligent driving, B's negligent standing in the road, and C's negligent driving caused B's personal injuries. The factfinder determines damages separately for B's automobile and B's person. The factfinder assigns separate percentages of responsibility to A and B for damage to B's automobile, considering A's parking and B's driving. A's and B's percentages add to 100 percent. The factfinder assigns a separate percentage of responsibility to A, B, and C for B's personal injury, considering A's parking, B's driving, B's standing in the road, and C's driving. A's, B's, and C's percentages add to 100 percent. After applying the rules in Topics 1-4 to each component injury, the court determines A's and C's liability to B by adding each party's liability for each component injury."

expressed by Hansa's experts.[3] If, however, the injury was continuing to worsen and became irreversible while plaintiff was under Hansa's care, as plaintiff's experts testified,[4] there was still only a single, indivisible brain injury, even if the injury had become partially uncorrectable before Hansa became involved. The extent of the damage that occurred prior to Hansa's involvement, and the extent to which the condition was aggravated by Hansa's failure to act, are fully and fairly measured by the determination of comparative fault.

Hansa argues that the jury could "infer that Dr. Hansa did not cause the part of the harm that was complete by the time he became involved." While that may be true, the evidence does not provide a reasonable basis for the jury to determine the amount of plaintiff's damages attributable to his condition before Hansa's involvement and the amount attributable to the aggravation caused by Hansa's delay in treatment. Hansa cites no expert testimony regarding the percentage of plaintiff's brain injury that was irreversible prior to Hansa's involvement or what the damages would have been had the outcome been improved by Hansa's prompt intervention. On appeal, he suggests that had the jury been properly instructed, it "could have apportioned damages by causation using

[3] Dr. Hansa's expert testified that the damage was essentially complete before Dr. Hansa became involved. He testified that " 'there is clear and irrefutable evidence clinically that Kody Myrick's brain was suffering damage for a long enough period of time that there was really no question that there would be permanent damage to his brain as of 12:10 a.m. [when Dr. Hansa became involved].' He further testified that plaintiff's 'situation right now with the left side of hemiparesis and right side function is largely what he had at around 1:30 in the morning.' "

[4] As Hansa acknowledges, "Plaintiff's expert testified that if plaintiff had undergone a thrombectomy before 8:15 a.m., 'more likely than not he would have ended up with a modified Rankin score of two or better, so a good outcome, as opposed to a four.' " According to the expert, the modified Rankin Scale is the standard measure of clinical outcome for stroke. The scale has six points, with zero being normal and six being dead. A modified Rankin Scale of zero to two is generally considered a good outcome. A person whose stroke outcome is a modified Rankin Scale of two "is able to take care of their own affairs and walk without assistance, whereas a modified Rankin of three indicates the need for some part-time or full-time assistance and some assistance in walking, and four is slightly more severe than that, . . . they can't walk independently, for example."

the verdict form it was given. In response to question 3 of the verdict form, the jury should have only determined plaintiff's damages which would not have occurred but for Dr. Hansa's negligence — as opposed to damages caused by other physicians' negligence which still would have occurred but for Dr. Hansa." He does not cite, however, any evidence on which the jury could have based such a determination. Nor did defendant's trial counsel attempt to make such an argument to the jury. The portion of defendant's closing argument devoted to damages is less than a full page in the reporter's transcript and was essentially, that if the jury reached the question of damages, "it's about 3 million, three and a half . . . or less." There was no discussion of allocation of responsibility.

We thus reject Hansa's argument regarding the divisibility of damages by causation, and find no error in the court's response to the jury's question.

## II. Cross-Appeal

Nine months after this action was filed, on July 27, 2012, plaintiff served Hansa with an offer to compromise under Code of Civil Procedure section 998 for $1 million. Hansa rejected this offer. Subsequently, before the matter went to trial, plaintiff entered into three settlements on three different dates, totaling $5,750,000.Following trial, the parties agreed that plaintiff was entitled to prejudgment interest, but disagreed as to the proper calculation under Civil Code section 3291.[5] Over plaintiff's objection, the court calculated interest for the period between the date of the section 998 offer and the date of entry of judgment at 10 percent per annum on the amount of the principal judgment entered against Hansa ($4,596,375), for an interest award of $473,426.

---

[5] Civil Code section 3291 provides in relevant part: "If the plaintiff makes an offer pursuant to Section 998 of the Code of Civil Procedure which the defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to Section 998 of the Code of Civil Procedure which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment."

In his cross-appeal, plaintiff contends the court erred in calculating the amount of prejudgment interest. Relying on *Deocampo v. Ahn* (2002) 101 Cal.App.4th 758 (*Deocampo*), he argues the court should have employed a staggered approach to the calculation of prejudgment interest; calculating interests in steps, applying the 10% interest rate to the amount of the judgment less only the amount of each settlement for the period between entry of that settlement until the next settlement was entered, i.e., subtracting from the verdict each settlement as it was entered (and paid). In *Deocampo*, the court upheld the following calculation: "Following the mandate of Civil Code section 3291, the court began its calculation of 10 percent interest by using the date of plaintiffs' offer, April 12, 1996, as a starting date. The amount of money to which this rate of interest was applied was $4,968,175, which is the sum of the jury's calculations of (1) plaintiff's past medical expenses and lost wages, and (2) the present value of his future medical expenses and lost wages. This interest was calculated to the date of the payment of the St. Joseph Medical Center settlement (June 20, 1997) and amounted to $590,736.48. [¶] Next, the court calculated interest from June 21, 1997, the day after the settlement with St. Joseph Medical Center, until October 18, 2000, the date of the judgment entered on the jury's verdict. The amount of money to which the statutory rate of interest was applied differed from the court's first calculation. This time, the court applied the rate of interest to $3,468,175, which is the original amount of the jury's discounted compensatory damage award ($4,968,175), less the $1.5 million settlement. This produced interest in the amount of $1,154,474.69. Together, the two amounts of prejudgment interest totaled $1,745,211.17." (*Id*. at pp. 780-781.) The court explained that this staggered approach insures that the plaintiff is fully compensated for his loss and encourages settlement. (*Id*. at p. 782.)

Applying a staggered approach to this case, the court would have calculated interest based on the jury's total verdict ($10,357, 587) from the date of the offer (7/27/2012) until the date of the first settlement (2/25/2013), then calculated additional interest based on the jury's verdict less the first settlement ($8,357,587) until the date of the second settlement (3/12/2013) and so on, subtracting the amount of each settlement

13

until calculating additional interest on the judgment against Hansa from the date of the last settlement (4/17/2013) until the entry of judgment. Plaintiff claims the total award under this approach would be $818,535.

Hansa argues the trial court correctly rejected this approach, concluding that it was inconsistent with use of the word "judgment" and not "verdict" in Civil Code section 3291. A similar argument was made in *Deocampo.* There the appellant argued, "the court erred in its prejudgment interest calculation because it used the jury's *verdict* in step one as the principal to which the interest rate was applied, and then used the *judgment* (i.e., the verdict less the settlement), in step two as the principal to which it applied the interest rate. [The appellant] assert[ed] this method is invalid because Civil Code section 3291 specifically states that 'the *judgment* shall bear interest at the legal rate of 10 percent per annum' (italics added), and a *judgment* is rendered after the trial court offsets a jury's award by the amount of a settlement." (*Deocampo*, *supra*, 101 Cal.App.4th at p. 781.) The court rejected this argument explaining, "Here it does not make sense to *literally* apply Civil Code section 3291. Rather, it was proper for the trial court to engage in its two-step process in determining prejudgment interest. Splitting the calculation *furthered* the purpose of section 3291 to compensate plaintiff for the loss of use, *during the prejudgment period*, of the damages to which he was entitled due to [defendant's] having negligently treated him. The trial court recognized that during the period of time between plaintiff's injury and the date of the judgment against [defendant], plaintiff was deprived of more compensatory damages prior to the settlement with St. Joseph Medical Center than he was after that settlement. After the settlement, he was deprived of $1.5 million less in damages than he was prior to the settlement. Therefore, the Civil Code section 3291 interest penalty was reasonably less after the settlement than before." (*Deocampo*, *supra*, at pp. 781-782.)

Hansa argues that *Deocampo* is wrongly decided. We disagree. Contrary to Hansa's argument, the approach adopted in *Deocampo* is consistent with the purpose of section 3291 to ensure that plaintiff is fully compensated for his or her loss to the extent that the negligence or fault of others has contributed to it. Hansa does not dispute that he

14

is jointly and severally liable for the full amount of the verdict and that the settlements were properly applied as offsets to that amount. To ensure that plaintiff is fully compensated for his loss, prejudgment interest must be calculated based on the full amount of the jury's verdict and reduced by each settlement payment at the time that payment was received. The *Deocampo* approach is also consistent with the policy favoring settlements. "If prejudgment interest against a nonsettling joint tortfeasor is calculated only on the balance of the judgment after settlements paid by others are deducted, plaintiffs would be discouraged from settling with one of multiple defendants because they would be unable to be fully compensated for their loss." (*Newby v. Vroman* (1992) 11 Cal.App.4th 283, 290.)[6] Finally, Hansa has cited no authority for his suggestion that the calculation of prejudgment interest is discretionary. Accordingly, the award of prejudgment interest is reversed and the matter remanded for recalculation.

## Disposition

The award of prejudgment interest is reversed and the matter remanded for recalculation. The judgment is affirmed in all other respects. Plaintiff is to recover his costs on appeal.

---

[6] Hansa's argument that plaintiff's approach would unfairly require him to pay interest on damages caused by other tortfeasors relies largely on his previously rejected claim that the damages in this case may be divided by causation. No additional discussion of this point is required.

                                               _____

                                               Pollak, J.

We concur:

_____

McGuiness, P. J.

_____

Siggins, J.